**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | |
| | : | **Case No: 21-MJ-296 (GMH)** |
| | : | |
| **CHRISTOPHER WORRELL,** | : | |
| | : | |
| **Defendant.** | : | |

**MEMORANDUM IN SUPPORT OF**
**MOTION FOR REVIEW OF RELEASE ORDER**

On January 6, 2021, the defendant Christopher Worrell, a self-avowed member of the Proud Boys, participated in an insurrection aimed at defeating the Constitution and interrupting the peaceful transfer of presidential power.  Worrell traveled and coordinated with other members of the Proud Boys in the days and hours leading up to the assault on the U.S. Capitol. When the time came, Worrell surged forward with a crowd of rioters to confront a line of police officers who were attempting to calm and hold back the crowd.  Wearing tactical gear and armed with a canister of pepper spray gel marketed as 67 times more powerful than hot sauce, Worrell advanced, shielded himself behind a wooden platform and other protestors, and discharged the gel at the line of officers.  Mere minutes later, the line of officers was breached, and a surge of rioters entered the seat of this Nation's Legislative branch.

The detention question in this case is much like that in the case of William Chrestman and should be answered the same way.  *United States v. Chrestman*, No. 21-MJ-218 (ZMF), 2021 WL 765662, at *2 (D.D.C. Feb. 26, 2021) (detaining the defendant).  Worrell, a Proud Boy member like Chrestman, also engaged in "pre-planning and coordination with other rioters before, during, and after the riot," which "raises grave concerns." *Id.* at *15.  Worrell, like Chrestman, "traveled to the nation's capital equipped with tactical gear in preparation for

1

conflict with law enforcement," including a tactical vest, communications equipment, and pepper spray gel. *Id.* Worrell, like Chrestman, "coordinated with members of the Proud Boys and others to come to Washington, D.C., to march on the Capitol, and to impede law enforcement at every turn once on the Capitol grounds." *Id.* And though Worrell did not—to the government's knowledge—enter the U.S. Capitol building, Worrell (unlike Chrestman) violently assaulted a line of law enforcement officers (or, at a minimum, others in the crowd), and subsequently lied to law enforcement about his conduct, refused to turn himself in where directed, and issued a vague threat about a potential witness. As in the *Chrestman* case, detention is merited here.

I.    **<u>BACKGROUND</u>**

A.    **Procedural History**

On March 12, 2021, defendant Christopher Worrell was arrested in his home state of Florida on an arrest warrant issued from the United States District Court for the District of Columbia by Magistrate Judge G. Michael Harvey in connection with a Criminal Complaint charging Worrell with:

- Knowingly Entering or Remaining in any Restricted Building or Grounds Without Lawful Authority While Carrying a Dangerous Weapon, in violation of 18 U.S.C. §§ 1752(a)(1) and (b)(1)(A);

- Knowingly Engaging in Disorderly or Disruptive Conduct in any Restricted Building or Grounds While Using a Dangerous Weapon, in violation of 18 U.S.C. §§ 1752(a)(2) and (b)(1)(A);

- Knowingly Engaging in an Act of Physical Violence in any Restricted Building or Grounds While Using a Dangerous Weapon, in violation of 18 U.S.C. §§ 1752(a)(4) and (b)(1)(A);

- Violent Entry and Disorderly Conduct on Capitol Grounds, in violation of 40 U.S.C. § 5104(e)(2); and

- Obstruction of Justice/Congress in violation of 18 U.S.C. § 1512(c)(2).

At his initial appearance in the Middle District of Florida, the government moved to detain the defendant without bond pending trial. The presiding magistrate judge denied the government's detention motion and released the defendant with certain conditions, including home detention and monitoring of the defendant's location via GPS monitoring. The magistrate judge also denied the government's oral motion to stay the defendant's release pending an appeal to this Court. The government then applied to this Court for a stay and moved under 18 U.S.C. § 3145(a) for review of the magistrate judge's release order. *See* Dkt. 6. This Court issued a stay, granted the government's motion for review, and directed the parties to submit any documents related to the hearing by 12:00 p.m. on March 15, 2021. *See* Dkt. 8. A hearing on Worrell's detention is scheduled for Tuesday, March 16, 2021, at 12:30 PM before this Court.

**B.     Statement of Facts[1]**

*Worrell's connections to the Proud Boys.* Worrell is an avowed member of the Proud Boys, which "'describes itself as a pro-Western fraternal organization for men who refuse to apologize for creating the modern world; aka Western Chauvinists,' and whose members 'routinely attend rallies, protests, and other First Amendment–protected events, where they sometimes engage in violence against individuals whom they perceive as threats to their values.'" *United States v. Chrestman*, No. 21-MJ-218 (ZMF), 2021 WL 765662, at *2 (D.D.C. Feb. 26, 2021) (quoting the government's affidavit). Proud Boys members often wear the colors yellow and black, as well as other apparel adorned with Proud Boys-related logos and emblems.

---

[1] The government also included a statement of facts in its Motion for Emergency Stay and for Review of Release Order, Dkt. 6 at . That statement of facts was based largely on the allegations made in the affidavit accompanying the Complaint. *See* Dkt. 1-1. This motion refers primarily to the affidavit accompanying the Complaint, but includes additional context as well as new information that the United States has learned since the filing of the Complaint. *See United States v. Chrestman*, No. 21-MJ-218 (ZMF), 2021 WL 765662, at *5 (D.D.C. Feb. 26, 2021) ("At the detention hearing, both the government and the defendant may offer evidence or proceed by proffer." (citing *United States v. Smith*, 79 F.3d 1208, 1210 (D.C. Cir. 1996) (per curiam)).

Worrell's connection to the Proud Boys is no secret.  When Worrell was arrested, he was wearing a shirt with the words "Proud Boys" emblazoned on it.  According to his live-in girlfriend, Worrell was not at his house when agents arrived to arrest him because he was traveling north to meet other Proud Boys to go camping.  In Worrell's house, law enforcement located numerous shirts, patches, and challenge coins featuring Proud Boys colors, logos, insignia, or specific Proud Boys chapters.

Months ago, Worrell participated in an interview with what appears to be a Turkish Public Broadcasting company about the Proud Boys while wearing a shirt that reads "PROUD BOYS" and features the black and yellow double laurel wreath logo that the Proud Boys have co-opted.



During the interview, Worrell stopped and talked with Enrique Tarrio, the self-described leader of the Proud Boys.

January 6, 2021 was not Worrell's first trip to Washington, D.C.   Open-source

photographs show Worrell in Washington, D.C. on December 12, 2020, around the time of planned protests and rallies regarding the December 14, 2020 meeting of the electors of the Electoral College.  Worrell and the other individuals in the photographs are standing in front of a restaurant in Washington, D.C. that has been noted in news reports as a location where Proud Boys members gathered on December 12, 2020.[2]  The individuals pictured below are wearing clothing that appears to be affiliated with the Proud Boys (including, for example, yellow clothing; a helmet and hat with "PB" emblazoned on them; and the Fred Perry yellow and black laurel wreath insignia that is now commonly worn by members of the Proud Boys).  Worrell appears to be wearing a Proud Boy patch on his tactical vest, which looks to be the same or similar to the vest he wore at the U.S. Capitol on January 6, 2021.[3]

---

[2] *See* I. Ward, *How a D.C. Bar Became the 'Haven' for the Proud Boys*, Politico Magazine (December 14, 2020) https://www.politico.com/news/magazine/2020/12/14/harrys-bar-proud-boys-washington-dc-445015
[3] The photographs state that they depict events on December 12, 2021, but that was presumably meant to refer to December 12, 2020.



Worrell also appears in an open-source video tweeted on December 12, 2020 in which he is verbally sparring with the videographer.   The location is recognizably downtown Washington, D.C.

When FBI agents searched Worrell's residence, they found a black shirt with the word "DC" and the date "12-12-20" on it in yellow lettering.   They also found a hotel key marked "Proud Boys DC 12-12-20."

***The events of January 6, 2021.***   On January 6, 2021, a joint session of the United States Congress convened at the U.S. Capitol.   During the joint session, elected members of the United States House of Representatives and the United States Senate were meeting in separate chambers of the United States Capitol to certify the vote count of the Electoral College of the 2020 Presidential Election, which had taken place on November 3, 2020. The joint session began at approximately 1:00 p.m. Shortly thereafter, by approximately 1:30 p.m., the House and Senate

adjourned to separate chambers to resolve a particular objection.  Vice President Michael Pence was present and presiding, first in the joint session, and then in the Senate chamber.

As the proceedings continued in both the House and the Senate, and with Vice President Pence present and presiding over the Senate, a large crowd gathered outside the U.S. Capitol. As noted above, temporary and permanent barricades were in place around the exterior of the U.S. Capitol building, and U.S. Capitol Police were present and attempting to keep the crowd away from the Capitol building and the proceedings underway inside.

At such time, the certification proceedings were still underway and the exterior doors and windows of the U.S. Capitol were locked or otherwise secured. Members of the U.S. Capitol Police attempted to maintain order and keep the crowd from entering the Capitol; however, around 2:00 p.m., individuals in the crowd forced entry into the U.S. Capitol, including by breaking windows and by assaulting members of the U.S. Capitol Police, as others in the crowd encouraged and assisted those acts.

Shortly thereafter, at approximately 2:20 p.m., members of the United States House of Representatives and United States Senate, including the President of the Senate, Vice President Pence, were instructed to—and did—evacuate the chambers. Accordingly, the joint session of the United States Congress was effectively suspended until shortly after 8:00 p.m. Vice President Pence remained in the United States Capitol from the time he was evacuated from the Senate Chamber until the sessions resumed.

***Worrell's preparations for January 6, 2021.***  According to Worrell's live-in girlfriend, who was interviewed by law enforcement on March 12, 2021, she and Worrell traveled to Washington D.C. in the days leading up to January 6, 2021, with other Proud Boys in vans paid for by another individual.  Their hotel rooms were also paid for by another individual.

On January 6, Worrell marched to the U.S. Capitol wearing tactical gear and prepared for a confrontation. The photograph on the left below shows a can of pepper spray gel clipped to his tactical vest, and a radio or communications device located over his left shoulder. Other photographs show a hydration pack on his back. The video screenshot on the right shows Worrell, while with the first wave of individuals to breach the Capitol grounds, wearing what appears to be a push-to-talk radio ear piece in his left ear.



Worrell's live-in girlfriend later stated to FBI agents that Worrell and other Proud Boys used radio communications devices on January 6, 2021.

Worrell also marched with a large group of other Proud Boys prior to the breach of the U.S. Capitol on January 6, 2021. The following photograph depicts Worrell in a large crowd including numerous other Proud Boys members on Constitution Avenue, N.W., near the courthouse. The second photograph similarly features Proud Boys members and was taken on the East Side of the U.S. Capitol prior to the breach of the Capitol.





***Worrell's assault on a law enforcement officer.***  By early that afternoon—some time

between 1 and 2 PM—Worrell had moved to the west side of the U.S. Capitol building, having advanced with a crowd that overwhelmed police barriers and barricades around the outside perimeter of the U.S. Capitol Grounds. The riotous crowd had surged to the steps of the U.S. Capitol building, and was just steps away from entrances to the building's interior. A single line of law enforcement officers stood between the crowd and those entrances. Numerous members of the crowd had, over the last half-hour, exchanged blows with, thrown objects at, and sprayed pepper spray or other chemicals at law enforcement officers attempting to hold back the crowd. Others had grabbed and carried away law enforcement crowd-control barriers, further exposing front-line officers to the crowd's fury. Law enforcement's ability to control the unruly crowd was at a tipping point.

It was at this precarious moment that Worrell chose to act. Moving forward, Worrell positioned himself next to a wooden stairway on the side of the plaza, unclipped a canister of pepper spray gel from his tactical vest, and discharged a stream of pepper spray gel toward law enforcement officers positioned outside of the frame of the following photograph.



The caption provided by the photographer who captured this moment was: "Pro-Trump

protesters uses papper [sic] spray against police during Capitol building riot." The following image, taken one minute after the photograph above by the same photographer, shows Worrell's target: a line of law enforcement officers on the left. The white platform that forms the backdrop of the photograph above of Worrell pepper spraying is visible on the lower left portion of the photograph.



The pepper spray gel Worrell used is marketed by its manufacturer as having "double the average strength" of other pepper sprays, and as being "67x hotter than hot sauce," providing "Maximum Stopping Power."[4]

Worrell then melted back into the crowd. The following photograph, taken minutes after his pepper-spray assault, depicts Worrell roughly ten yards back from the location of the assault, among a crowd of individuals. The photograph on the left is a zoomed-in version of the photograph on the right, in which Worrell is circled in red. Several identified Proud Boys are

---

[4] *See* https://www.sabrered.com/pepper-spray/tactical-pepper-gel-flip-top-belt-holster. The affidavit accompanying the Complaint in this case explains how law enforcement identified the brand of pepper spray gel used by Worrell. *See* Dkt. 1-1 at ¶ 15. A canister of Sabre Red Maximum Strength pepper gel was subsequently recovered from Worrell's residence.

in his immediate vicinity.



Shortly after that photograph was taken, the line of law enforcement officers was breached, leading to the rioters entering the U.S. Capitol building and continuing to assault law enforcement officers at some entrances to the building for hours.

***The investigation into Worrell***.  On January 13, 2021, the FBI was notified via a non-anonymous tip that Worrell had participated in the riots on January 6, 2021.  The tipster, who knows Worrell, stated that he had seen video uploaded by Worrell to Worrell's Facebook account that depicted Worrell at the U.S. Capitol on January 6, 2021.  According to the tipster, the video depicted Worrell "issuing commands to other rioters."  Law enforcement has to date been unable to obtain this video, as it was taken down or made private by Worrell after the tip was submitted.

Responding to that tip, Worrell was interviewed by FBI agents on January 18, 2021.  Worrell was extremely agitated that the FBI was at his house.  Worrell eventually admitted that he was at the U.S. Capitol on January 6, 2021, but denied entering the U.S. Capitol building, and specifically denied any other wrongdoing or criminal conduct on his part.  He also became

agitated when asked about the Proud Boys, and expressed his concern that the FBI would classify the organization as a domestic terrorist group. Worrell did not mention that he had pepper sprayed law enforcement officers (or anyone else in the crowd) while at the U.S. Capitol. Worrell's denial of criminal misconduct beyond being present at the U.S. Capitol led to a significant delay in his identification as the individual photographed above pepper-spraying law enforcement.

On March 12, 2021, the FBI executed a search warrant at Worrell's residence, where they expected to arrest Worrell. But Worrell was not home, having left to go camping. With his girlfriend's assistance, law enforcement officers contacted Worrell via phone. An FBI agent instructed Worrell to turn himself in to the nearest FBI resident agency in Sarasota, Florida. Worrell declined and stated that he would turn himself to the FBI at his residence, which was several hours away. The FBI, which was at that point primarily concerned about the danger Worrell posed to himself or others given the apparent strong emotions he was exhibiting over the phone, determined that for public safety reasons it would not force him to turn himself in at Sarasota. Worrell's refusal to cooperate with law enforcement's request meant that he had several hours with his phone—crucial evidence in the case—after being notified that he was going to be arrested. By the time he arrived, Worrell was cooperative in other respects.

At Worrell's residence, law enforcement officers located the following items that appear to match the items Worrell had on January 6, 2021: an American-flag neck gaiter; a camouflage-colored Hydramax hydration pack Worrell wore on his back on January 6; a sweatshirt and pair of tactical pants appearing to match those he wore on January 6; and a canister of Sabre Red Maximum Strength pepper spray gel, the brand of pepper spray that FBI agents identified as that Worrell used on January 6. In addition, agents found several maps of Washington, D.C.

Agents did not locate Worrell's tactical vest or a GoPro-style camera matching the appearance of the camera on his vest on January 6, 2021.

While he was being arrested, Worrell told law enforcement that he knew who had alerted the FBI to his activities, and offered a specific individual's name. He also stated that he was upset at a particular Twitter user who had exposed his identity online and that, if he ever found that person, the FBI would "be coming for me again," or words to that effect.

## II.   **ARGUMENT**

### A.   **This Court reviews the magistrate judge's release order *de novo*.**

Title 18, U.S.C. § 3145(a) states:

**(a)**   Review of a release order – If a person is ordered released by a magistrate, …

**(1)**   the attorney for the Government may file, with the court having original jurisdiction over the offense, a motion for revocation of the order or amendment of the conditions of release . . .

The motion shall be determined promptly. *Id.* As this Court has previously concluded, under Section 3145(a), "a district court reviews a magistrate judge's release or detention order *de novo*." *Chrestman*, 2021 WL 765662, at *5. In its discretion, the Court may proceed to rehear the evidence by recalling the witnesses, reviewing transcripts, or by proceeding through proffer and argument. *Id.* Indeed, the "rules concerning the admissibility of evidence in criminal trials do not apply to the presentation and consideration of information at the [detention] hearing." 18 U.S.C. § 3142(f). Specifically, the presentation of hearsay evidence is permitted. *Id.*; *United States v. Smith*, 79 F.3d 1208, 1210 (D.C. Cir. 1996). Moreover, the government is not required to "spell out in precise detail how the government will prove its case at trial, nor specify exactly what sources it will use." *United States v. Martir*, 782 F.2d 1141, 1145 (2d Cir. 1986); *United States v. Williams*, 798 F. Supp. 34, 36 (D.D.C. 1992). A

pretrial detention hearing should not be used as a discovery device.  *Smith*, 79 F.3d at 1210, *see also Williams*, 798 F. Supp. at 36.

**B.    Worrell is eligible for detention under Section 3142(f).**

Under the Bail Reform Act, "a detention hearing must be held at the government's request only 'in a case that involves' a charged offense falling in one of five enumerated categories" listed in 18 U.S.C. § 3142(f)(1)(A)-(E), or that involves a serious risk of flight or of, among other things, attempting to obstruct justice.  *Chrestman*, 2021 WL 765662, at *4.

Here, the defendant is subject to detention pursuant to 18 U.S.C. § 3142(f)(1)(E) because he is charged with felonies involving a dangerous weapon.  Specifically, Worrell is charged with violations of 18 U.S.C. §§ 1752(a)(1), (a)(2), and (a)(4), all with the penalty enhancement applicable to those charges under Section 1752(b)(1)(A), which applies when the defendant, "during and in relation to the offense, uses or carries a deadly or dangerous weapon or firearm." *Id.* § 1752(b)(1)(A).  As discussed in the statement of facts, the complaint charges that Worrell carried pepper spray on his person while entering the restricted portion of U.S. Capitol grounds on January 6, 2021, in violation of Section 1752(a)(1), and then deployed that pepper spray in a dangerous assault on the west side of the U.S. Capitol, in violation of Section 1752(a)(2) and (a)(4).  Numerous courts have concluded or suggested that pepper spray constitutes a "dangerous weapon," at least as that term is defined in the U.S. Sentencing Guidelines to mean "an instrument capable of inflicting death or serious bodily injury."  *United States v. Krueger*, No. 13-20242, 2013 WL 8584873, at *2 (E.D. Mich. July 10, 2013) ("Pepper spray has been considered a dangerous weapon, at least in the context of sentencing guideline calculations."); *United States v. Melton*, 233 F. App'x 545, 547 (6th Cir. 2007) (unpublished) ("[B]ased on the severe and probable effects that pepper spray has on the human body, the district court's

determination that pepper spray constitutes a 'dangerous weapon' was not erroneous."); *United States v. Neill*, 166 F.3d 943, 949 (9th Cir. 1999) (finding that pepper spray used by defendant was a "dangerous weapon," warranting an increase in sentencing); *Logan v. City of Pullman*, 392 F.Supp.2d 1246, 1261 (E.D. Wash. 2005) (same); *Norris v. Lafler*, 2008 WL 786661, (E.D. Mich. 2008).  As several of these courts have noted, pepper spray is capable of causing severe pain and serious bodily injury, particularly to those who are asthmatic or have other underlying conditions.  *Neill*, 166 F.3d at 949-50.

The defendant is also subject to detention because he presents a "serious risk" that he "will obstruct or attempt to obstruct justice."  18 U.S.C. § 3142(f)(2)(B).  As noted above, Worrell lied to the FBI when first interviewed regarding the scope of his criminal conduct on January 6, when he apparently believed he could get away with it.  That obstructive conduct that delayed the investigation and his arrest, and evidence—particularly electronic evidence— may have been deleted intentionally or simply unintentionally overwritten on Worrell's electronic devices in the meantime.  On March 12, Worrell refused to turn himself in to the nearest FBI resident agency, instead stating that he would only turn himself in at his residence—again leading to a delay in taking Worrell into custody and seizing his cell phone. Worrell's willingness to lie to the FBI and subsequently disregard a direct command to turn himself in immediately raises a serious risk that, if released, Worrell may disregard conditions imposed on him, or may delete or destroy evidence (particularly electronic evidence of which the government may be unaware), or alert other individuals who were present on January 6 to do the same.  Finally, Worrell stated that he believed he knew who had tipped off the FBI, and made a vague threat toward a particular Twitter user who had posted photographs of him on January 6, 2021, conduct that raises potential witness-intimidation concerns if Worrell is

released.

**C.      Worrell should be detained due to his dangerousness and risk of obstruction of justice.**

This Court should detain Worrell due to the danger he poses to the public, as demonstrated by his flagrant disregard for the safety of law enforcement and for the rule of law during his assault on January 6, 2021.  The officers Worrell assaulted were the last line of defense of the U.S. Capitol building, within which were hundreds of members of this nation's legislative branch and several persons in the presidential line of succession.  And the impact of Worrell's assault was cumulative with that of other assaults on law enforcement officers; over 100 officers reported being assaulted or injured by the violent mob that day, which led to the security perimeter's collapse.

Also favoring detention is Worrell's prior obstructive conduct, as just described and as described in greater detail below.

Based on the information known to it at this time, the government does not contend that Worrell poses a serious risk of flight.  Although, as noted above, he refused to turn himself in locally, Worrell was eventually convinced to drive several hours to turn himself in to law enforcement.  But just as in *Chrestman*, "the fact that defendant did not flee or evade arrest does little to mitigate the heavy weight of the other factors favoring detention, given the clear danger he poses to the community and the fact that he engaged in conduct after January 6, 2021 that may have resulted in missing or obstructed evidence."  *Chrestman*, 2021 WL 765662, at *15.

The Court reviews four factors under Section 3142(g) in determining whether to detain Mr. Worrell pending trial: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against Mr. Worrell; (3) his history and characteristics; and (4) the

nature and seriousness of the danger to any person or the community that would be posed by his release. *See* 18 U.S.C. § 3142(g).  There is no condition or combination of conditions that would assure the safety of the community.  *See* 18 U.S.C. § 3142(e)(1).

     **1.**    **The Nature and Circumstances of the Offense.**

In this Court's earlier opinion in *Chrestman*, it set forth the criteria by which it would evaluate "the comparative culpability of a given defendant in relation to fellow rioters" under Section 3142(g)(1).  Six of the seven criteria outlined by the Court favor detention here.

1.    The first consideration is whether "a defendant has been charged with felony or misdemeanor offenses," as "the nature of a felony offense is . . . substantially more likely to weigh in favor of pretrial detention than the nature of a misdemeanor offense." *Chrestman*, 2021 WL 765662, at *7.  Worrell is charged with four felonies.

2.    The second consideration is whether there is "any indication that a defendant engaged in prior planning before arriving at the Capitol, for example, by obtaining weapons or tactical gear," as that "suggests that he was not just caught up in the frenzy of the crowd, but instead came to Washington, D.C. with the intention of causing mayhem and disrupting the democratic process, mandated under the U.S. Constitution, of counting and certifying Electoral College votes." *Id.* at *8.

As explained above, Worrell wore tactical gear on January 6, including (at least) a tactical vest and a radio communications device he used to communicate with other Proud Boys. He chose to advance past barriers to the steps of the U.S. Capitol building with a highly potent form of pepper spray gel which he subsequently deployed against law enforcement.  There is no need to possess self-defense weaponry at the U.S. Capitol, one of the most heavily policed areas in Washington, D.C. Worrell's mere carrying of pepper spray gel is thus an act that would have

been unnecessary if he did not anticipate a confrontation at the Capitol.

Every indication is that Worrell came prepared to confront and potentially violently assault law enforcement at the U.S. Capitol building.  There is no other plausible explanation for Worrell's choice to bring pepper spray gel onto the U.S. Capitol grounds other than for an offensive, armed assault.  Nor is there any other plausible target of his pepper spray attack.

3.     The third consideration is whether a defendant "carr[ied] or use[d] during the riot . . . a dangerous weapon," because that "indicates at least some degree of preparation for the attack and an expectation that the need to engage in violence against law enforcement or, indeed, the Legislative branch, might arise," and so "speak volumes to both the gravity of the charged offense, as a premeditated component of an attempt to halt the operation of our democratic process."  *Id.*  Again, here Worrell carried pepper spray gel designed to incapacitate its target.

4.     The fourth consideration is whether there is "[e]vidence of coordination with other participants before, during, or after the riot," which "indicates that a defendant acted deliberately to amplify and assure the success of the breach of the Capitol."  *Id.*  Worrell traveled to Washington, D.C. in a caravan of Proud Boys members that was funded by someone else.  He marched to the U.S. Capitol building on January 6 with a mob of Proud Boys members.  He communicated with them via radio equipment.  And in the vast majority of photographs and videos of Worrell from that day, at least one other Proud Boy is visible and in his vicinity.

5.     The fifth consideration is whether the defendant "assumed either a formal or a de facto leadership role in the assault by encouraging other rioters' misconduct."  *Id.*  Here, the tipster (who is known to law enforcement and who knows Worrell) stated to the FBI that he had viewed a video uploaded by Worrell to Facebook in which Worrell was issuing commands to other rioters on January 6.  (The FBI does not yet have other evidence indicating that Worrell

assumed a leadership role on January 6.)  Though the FBI has not itself viewed the video, the fact that Worrell prevented the FBI from doing so by deleting or making private the video should not count in his favor.

6.    The sixth consideration is whether the defendant "remained only on the grounds surrounding the Capitol" or instead "breached the interior of the Capitol building." *Id.*  Here, the FBI does not currently have reason to believe that Worrell entered the U.S. Capitol building. This factor thus favors Worrell.

7.    The seventh consideration is whether the defendant "injured, attempted to injure, or threatened to injure others," as that conduct "is more troubling than the conduct of a defendant who . . . merely wandered the premises." *Id.*  Moreover, "[g]rave concerns are implicated if a defendant actively threatened or confronted federal officials or law enforcement . . . ." *Id.*

There is no question Worrell attempted to injure others.  The photograph of Worrell spraying officers does not depict any threat to Worrell; to the contrary, Worrell fired his pepper spray gel from a position of relative safety behind other protestors.  And Worrell's intended target was a line of law enforcement officers who were the last line of defense between a riotous mob thousands of individuals strong and some of the most important members of this country's Executive and Legislative branches.

In sum, Worrell's conduct on January 6, 2021 evinces his "disregard for the institutions of government and the rule of law, qualities that bear on both the seriousness of the offense conduct and the ultimate inquiry of whether a defendant will comply with conditions of release meant to ensure the safety of the community."  *Chrestman*, 2021 WL 765662, at *9.

### 2.    The Weight of the Evidence Against Worrell.

The evidence against Worrell is strong.  Photographic and video evidence establish his

presence on U.S. Capitol grounds and in a restricted area.  Photographic evidence shows his carrying and then use of pepper spray gel, a dangerous weapon.  Many of the items shown in the pictures from that day were recovered in a search of his residence.  Those facts alone constitute proof of the Section 1752 and Section 5104 offenses.

Equally clear is the intended target of his assault.  The government has not yet sifted through the full mountain of video and photographic evidence that depicts the area and time of Worrell's assault.  But even at this preliminary stage, there is the following: an eyewitness photographer both captured Worrell spraying pepper spray and described him as targeting law enforcement officers; other video captured Worrell in or near that location at or near the time of the assault; and photographs establish the location of law enforcement officers at virtually the same time as that assault.  The contextual evidence, including Worrell's allegiance to the Proud Boys and his choice to carry pepper spray gel into a situation where a riotous mob was assaulting a line of law enforcement officers, eliminates any plausible explanation for Worrell's conduct other than that he was (at least) attempting to assault law enforcement.  The evidence that Worrell sprayed pepper spray gel at law enforcement officers—and so is guilty of obstruction under Section 1512 as charged and other currently uncharged felonies[5]—is thus also strong.

In any event, Worrell at a minimum deployed pepper spray gel in a riot as a participant of the riot.  This fact alone underscores the need for his pretrial detention.

### 3.    The History and Characteristics of the Defendant.

Worrell's criminal history, while not particularly recent, is more extensive than that of William Chrestman.  Worrell has five arrests and three prior convictions.  Worrell's most recent

---

[5] The government has not yet charged Worrell with assault under 18 U.S.C. § 111, but is continuing to investigate that and other potential offenses, and anticipates additional charges relating to the assault.  That the government has not yet charged Section 111 should not be taken as an indication of the government's view of the evidence supporting such a charge.

arrest, in 2009—when he was 37—is particularly troubling.  According to the arrest report, Worrell attempted to pull over a woman who he believed had run a red light.  *See* Ex. 1, at 3. While driving next to her, the victim reported that he flashed a "gold colored badge," insisted that she pull over, and pulled behind her vehicle.  *Id.*  Luckily, the victim happened to be a dispatcher for the local Sheriff's Office, and drove for approximately one mile to a business's parking lot rather than pulling over.  *Id.*  Worrell tailed the woman nearly the entire time, leaving only when she turned into the parking lot.  *Id.*  When law enforcement caught up to him, Worrell denied having flashed a badge and claimed that rather than tailing the woman, he just happened to also be going to a store at that intersection, but had accidentally turned the wrong way.  *Id.* In his vehicle, officers found a Glock-22, several boxes of ammunition, two knives, two pairs of handcuffs and handcuff keys, a can of pepper spray, a tactical flashlight, and a gold badge Worrell had purchased off of the internet.  *Id.*  Worrell pled no contest.  Needless to say, January 6, 2021 was not the first time Worrell brought tactical gear (including pepper spray and other weapons) to instigate a dangerous, unlawful confrontation.

Further, Worrell has already demonstrated his willingness to obstruct a law enforcement investigation.  When interviewed on January 18, 2021, Worrell admitted being present at the U.S. Capitol but claimed he had engaged in no wrongdoing.  That is belied by the photographs above, which at a bare minimum show Worrell engaging in an act of physical violence in a crowded area.  Moreover, as in *Chrestman*, law enforcement was unable to locate several distinctive items Worrell wore that day, including his radio communications device, his tactical vest, and the GoPro-style camera he used.  *Chrestman*, 2021 WL 765662, at *14 (finding that it favored detention that "a number of items that could . . . corroborate [Chrestman's] role in the events of January 6, were missing").  Worrell has demonstrated that he is willing to obstruct

justice when he believes he can get away with it.  The government has every reason to believe he may attempt to do so again if released.

### 4. The Nature and Seriousness of the Danger Posed by the Defendant's Release.

As in *Chrestman*, the same considerations outlined in subpart 1 above regarding the nature and circumstances of the defendant's January 6, 2021 conduct largely informs the dangerousness analysis here.  *Chrestman*, 2021 WL 765662, at *15.  Worrell's troubling arrest for impersonating a law enforcement officer, as well as his willingness to lie to law enforcement when confronted with his unlawful conduct, simply confirms the serious danger Worrell poses to the community and to law enforcement's ability to undertake its investigation.  And, as already explained, Worrell further made vague threats toward at least one Twitter user who posted photographs of him from January 6, 2021, and also relayed his belief that he knew who had provided a tip to the FBI regarding his conduct that day.

## III.  CONCLUSION

The Court should grant the government's motion and enter an order detaining the defendant without bond pending trial.

Respectfully submitted,

CHANNING D. PHILLIPS
ACTING UNITED STATES ATTORNEY


*/s/ William Dreher*
WILLIAM DREHER
D.C. Bar No. 1033828
Assistant United States Attorney (Detailed)
700 Stewart Street, Suite 5220
Seattle, WA 98101
(202) 553-4579
william.dreher@usdoj.gov

23

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on March 15, 2021, I served a copy of this pleading on defendant's counsel through the Court's electronic filing system.

_/s/ William Dreher_
William Dreher
Assistant United States Attorney